No. 522 June 10, 2026 463

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

CHAD BRANDON PITCHER,
*Defendant-Appellant.*

Washington County Circuit Court
17CR63109; A182682

Janelle F. Wipper, Judge.

Argued and submitted January 7, 2026.

Morgen E. Daniels, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Oregon Public Defense Commission.

Joanna Hershey, Assistant Attorney General, argued the cause for appellant. Also on the brief were Dan Rayfield, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, Joyce, Judge, and Hellman, Judge.

JOYCE, J.

Affirmed.

**JOYCE, J.**

Defendant appeals from the judgment convicting him of first-degree manslaughter, unlawful use of a weapon, and felon in possession of a firearm, raising 11 assignments of error. In defendant's first assignment of error, he challenges the trial court's failure to suppress evidence of Facebook messages that defendant sent to the victim, R, that police had obtained through a search of R's Facebook account records. In his second assignment of error, he contends that the trial court erred when it ruled that R's Facebook account records were admissible hearsay under the business records exception. In his third assignment of error, he argues that the trial court erred in denying defendant's motion to suppress a statement that he made during a custodial interview conducted after his right to counsel under Article I, section 11, of the Oregon Constitution had attached. In his fourth assignment of error, he assigns plain error to the trial court's failure to define "initial aggressor" in the self-defense jury instructions. Finally, in defendant's fifth through eleventh assignments of error, he contends that the court plainly erred in allowing the state to make improper closing arguments that deprived defendant of the right to a fair trial. We affirm.

In 2017, R stole defendant's truck. Several days later, defendant had an acquaintance drive him to find R and confront him about the stolen truck. Upon finding R and the truck, defendant and his acquaintance exited the car, each holding a gun, and approached R. Shortly after initiating the confrontation, both defendant and his acquaintance fired a single shot from their respective guns. R immediately ran off, and defendant and his acquaintance drove off. R died from a gunshot wound resulting from the incident.

The state charged defendant with first-degree murder, unlawful use of a weapon, and felon in possession of a firearm. At defendant's first trial, held in 2019, a nonunanimous jury found defendant guilty of first-degree manslaughter, unlawful use of a weapon, and felon in possession of a firearm. Defendant appealed, and we reversed and remanded for a new trial on the first-degree manslaughter and unlawful use of a weapon counts. *State v. Pitcher*, 317 Or App 269,

270, 504 P3d 701 (2022) (accepting the state's concession that the trial court erred by instructing the jury that it could convict based on nonunanimous verdicts on all three counts, but only reversing as to the first two counts because the third count received a unanimous guilty verdict and the error was therefore harmless). At defendant's second trial, held in 2023, a unanimous jury found defendant guilty of first-degree manslaughter and unlawful use of a weapon. This appeal follows.

## I.   MOTION TO SUPPRESS FACEBOOK MESSAGES

In his first assignment of error, defendant contends that the trial court erred in denying his motion to suppress Facebook messages that defendant had sent to R and that the state obtained pursuant to a search warrant of R's Facebook account records. "We review a trial court's denial of a motion to suppress for legal error, and we are bound by the trial court's factual findings if there is any constitutionally sufficient evidence in the record to support them." *State v. Maciel-Figueroa*, 361 Or 163, 165-66, 389 P3d 1121 (2017).

Several days before R's death, defendant sent R multiple threatening messages via Facebook Messenger, including a message that defendant would "gut" R and another where defendant wrote, "Im done playn homie my truck is gonna cost ur life put that on my kids mother fucker."

The state obtained two warrants directed at Facebook, with one targeting defendant's Facebook account records (CP warrant) and the other targeting R's Facebook account records (R warrant). The two warrants were supported by a single affidavit and requested multiple items[1]

---

[1] These items included:

- "User Contact information";
- "Internet Protocol (IP) address logs";
- "Content of private messages (sent/inbox)";
- "Private message headers";
- "Subject lines in private message headers";
- "Stored user files (blogs, images, friends)";
- "Photoprint of user ID of the listed Facebook accounts";
- "Neoprint of user ID of the listed Facebook accounts"; and
- "GPS information from pictures and post[s] made to the listed Facebook accounts."

from the respective Facebook accounts that existed over the course of a two-month period, including the "[c]ontent of private messages." At the second trial, Detective Verboort testified that he served both warrants on Facebook at the same time through its online portal. Facebook provided the requested records in response to each warrant, including the records of the messages defendant had sent to R.

Defendant moved to suppress the evidence obtained from the CP warrant, arguing that the CP warrant was unconstitutionally overbroad. The trial court ruled that the motion was moot since the state was offering evidence obtained only from the R warrant and defendant could not challenge that warrant because his personal rights were not violated by its execution. Defendant disagreed, explaining that, if the court found that the CP warrant was unconstitutionally overbroad, then the state would need to show that the R warrant had not been tainted by that overbreadth.

At a later hearing, defendant moved to suppress the messages he had sent to R that the state obtained through the R warrant, arguing that he could directly challenge the constitutionality of that warrant because he had a protected privacy interest under Article I, section 9, of the Oregon Constitution and a reasonable expectation of privacy under the Fourth Amendment to the United States Constitution in the copies of his messages that were delivered to and located in R's account. The trial court denied the motion, concluding that defendant did not have a privacy interest in those copies of his messages and therefore could not challenge the constitutionality of the R warrant. Defendant appeals, renewing his argument that he had a protected privacy interest or a reasonable expectation of privacy in the contents of the copies of his messages he sent to R that were located in Facebook's records of R's account.

Following our typical methodology, we begin our analysis with Article I, section 9, and if we find the right was not implicated, we then analyze the issue under the Fourth Amendment. *Sterling v. Cupp*, 290 Or 611, 614, 625 P2d 123 (1981). We conclude that defendant did not retain a protected privacy interest or a reasonable expectation of privacy in the copies of his messages that were delivered to

and located in R's Facebook account records. Therefore, the court did not err in denying defendant's motion to suppress.

Article I, section 9, provides that "[n]o law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]" The government conducts a "search" under this section when "it invades a protected privacy interest." *State v. Brown*, 348 Or 293, 297, 232 P3d 962 (2010). Such interests are "not defined by private property or contractual rights, although such rights may inform the analysis in a given case," but rather "as *determined by social and legal norms of behavior*, such as trespass laws and conventions against eavesdropping." *State v. Lien/Wilverding*, 364 Or 750, 759-60, 441 P3d 185 (2019) (emphasis in original; internal quotation marks omitted). As such, "[r]ights under section 9 are defined not by the privacy one expects but by the privacy one has a right to expect *from the government*." *State v. Tanner*, 304 Or 312, 321 n 7, 745 P2d 757 (1987) (emphasis in original). This focus on the expectations that society sets on government conduct, rather than individual expectations of privacy, "enables us to frame the fundamental question underlying an Article I, section 9, challenge as follows: whether the government's conduct, if engaged in wholly at the discretion of the government, will significantly impair the people's freedom from scrutiny[.]" *State v. De Witt Simons*, 375 Or 70, 80-81, 587 P3d 311 (2026) (internal quotation marks omitted). This focus also "*requires* Article I, section 9, to be 'read in light of the ever-expanding capacity of individuals and the government to gather information by technological means *** [and to] speak to every possible form of invasion—physical, electronic, technological, and the like.'" *Id.* at 81 (quoting *State v. Smith*, 327 Or 366, 373, 963 P2d 642 (1998) (emphasis, ellipsis, and brackets in original)).

A person's entrustment of an effect to a third party is generally sufficient to establish a privacy interest in that effect. *See Tanner*, 304 Or at 323 (finding that the defendant had a continuing privacy interest in stolen video tapes and equipment obtained by police through a search because he physically entrusted those effects to a couple as collateral

for a loan). But that entrustment principle does not apply to the contents of text message communications delivered to a third party. *State v. Carle*, 266 Or App 102, 110, 337 P3d 904 (2014), *rev den*, 356 Or 767 (2015). In *Carle*, we distinguished the act of sending messages to another person from the entrustment that the court found had occurred in *Tanner*:

> "In *Tanner*, the privacy interest was the product of a particular relationship in which the defendant could expect that his property, held as collateral, would be kept safe and returned if he repaid the loan. Here, as the state observes, 'nothing suggests that defendant possessed any ability to retrieve her text from [the recipient]'s phone or otherwise "reclaim" it once it was received.'"

*Id.* Because the defendant in *Carle* "lost the ability to control the dissemination of the digital copy of the message stored on [the recipient]'s phone," the message was not "entrusted" to the recipient, and the defendant therefore did not have a protected privacy interest in the copy of the message discovered through a search of the recipient's phone. *Id.* Facebook messages, like text messages, have digital copies stored in both the sender's and recipient's accounts. And like the defendant in *Carle*, defendant lost the ability to control the copies of his messages sent to R once they were delivered to R's Facebook account. As a result, defendant did not retain a privacy interest in the contents of those copies.

However, defendant argues that the key difference between the facts of *Carle* and those of this case is that the warrant in *Carle* was directed at the recipient's phone, while the R warrant was directed at Facebook and thus involved searching for defendant's messages in Facebook's records of R's account. Defendant argues that the copies of his messages located in either his or R's account records are essentially entrusted to Facebook under *Tanner* and are therefore protected from unlawful searches directed at Facebook specifically.

We disagree. Although defendant may retain a protected privacy interest in the contents of the copies of his messages, and other personal information, located in

Facebook's records of his own account,[2] we need not address that question today. The question before us is whether defendant "entrusted" the copies of his messages located in Facebook's records of R's account to Facebook, and as a result maintained a protected privacy interest in those copies; we conclude that he did not. Defendant has not demonstrated personal access to or control over R's account, let alone Facebook's records of that account. Additionally, defendant has not shown that he maintained any *Tanner*-like relationship with Facebook with respect to R's account where he could expect to retrieve the copies of his messages once those messages were delivered. Without the ability to retrieve or otherwise control R's account records, defendant cannot show that he entrusted those messages to Facebook and therefore does not have a protected privacy interest in those records under Article I, section 9.

We similarly conclude that defendant did not have a reasonable expectation of privacy under the Fourth Amendment in the copy of his messages located in R's account records. A search occurs under the Fourth Amendment when "an individual seeks to preserve something as private, * * * [their] expectation of privacy is one that society is prepared

---

[2] We have previously held that a person does not have a protected privacy interest in a third-party provider's digital records of certain *non-content* information. *State v. Delp*, 218 Or App 17, 26-27, 178 P3d 259, *rev den*, 345 Or 317 (2008) (concluding that the defendant did not have a protected privacy interest in non-content records of the defendant's internet usage held and maintained by an internet service provider for its own purposes). Although we have not yet explicitly decided whether a person maintains a protected privacy interest in a third-party provider's records of the *contents* of communications, *see State v. Goode*, 335 Or App 108, 111, 557 P3d 1132 (2024), *rev den*, 373 Or 280 (2025) (acknowledging that the parties did not dispute that the defendant had a protected privacy interest in the contents of his Facebook messages that were searched and seized through a warrant directed at Facebook's records of the defendant's account), the Oregon Supreme Court has identified a "cognizable privacy interest in the *content* of [a person's] telephone calls," *State v. Johnson*, 340 Or 319, 336, 131 P3d 173 (2006) (emphasis in original). Additionally, the Oregon Supreme Court recently held that a person's protected privacy interest in the records of their personal internet activity is not extinguished just because use of private and public Wi-Fi networks necessarily risk exposure of activity to the third-party providers of those networks. *See De Witt Simons*, 375 Or at 87 ("[W]e conclude that it is a necessary concession of modern life that, to use the internet, one must access it through channels controlled by others, which make one's browsing activity potentially viewable by third parties. That does not change the societal norm that a person's internet searches and browsing activities are reasonably considered to be private.").

to recognize as reasonable," and the government intrudes upon that "private sphere." *Carpenter v. United States*, 585 US 296, 304, 138 S Ct 2206, 201 L Ed 2d 507 (2018) (internal quotation marks omitted). The "capacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 US 128, 143, 99 S Ct 421, 58 L Ed 2d 387 (1978). Here, defendant has not shown that he had a "legitimate expectation of privacy" in R's Facebook account records. Defendant's expectation of privacy in the contents of the copies of his messages that he sent to R was extinguished upon delivery of those copies to R's account. *See Smith v. Maryland*, 442 US 735, 743-44, 99 S Ct 2577, 61 L Ed 2d 220 (1979) ("[A] person [generally] has no legitimate expectation of privacy in information [they] voluntarily turn[] over to third parties."). Furthermore, even if defendant could argue that he maintained a reasonable expectation of privacy in the copies of his messages contained in Facebook's records of his own account, defendant cannot show that he, personally, sought to preserve R's account records as private. For those reasons, we conclude that defendant did not maintain a reasonable expectation of privacy in the copies of his messages located in R's account records following delivery.

Defendant nevertheless argues that, even if he did not retain a protected privacy interest or reasonable expectation of privacy in the copies of his messages in R's account records, he could still challenge the constitutionality of the R warrant indirectly by demonstrating that the CP warrant was overbroad and shifting the burden to the state to prove that the R warrant was not tainted by that overbreadth. In defendant's view, because he showed that both warrants were nearly identical, supported by the same affidavit, executed at the same time, and resulted in the same evidence, defendant had established a minimal factual nexus between the alleged overbreadth of the CP warrant and the evidence obtained from the R warrant that shifted the burden to the state to prove that the evidence obtained was not tainted by the alleged constitutional violation. *See State v. DeJong*, 368 Or 640, 655, 497 P3d 710 (2021). The state responds that the

*DeJong* burden-shifting framework applies only to a single "mixed" warrant that contains both lawful and unlawful search categories to determine whether the unlawful parts of the warrant tainted the lawful parts. *See State v. Turay*, 371 Or 128, 168, 532 P3d 57 (2023) (applying the *DeJong* framework to a single warrant). Here, defendant is arguing that the CP warrant's unconstitutionality tainted the separate R warrant, a situation which the state contends does not implicate the *DeJong* burden-shifting framework.

However, we do not address whether the *DeJong* test can apply to separate warrants because, even if the R warrant was found unconstitutional, defendant cannot suppress the evidence obtained through the R warrant without a protected privacy interest in R's account records. Evidence obtained in violation of Article I, section 9, is subject to suppression only if the unlawful search violated *defendant*'s personal privacy rights. *See State v. Avalos-Izquierdo*, 175 Or App 229, 233-34, 27 P3d 528 (2001), *rev den*, 334 Or 190 (2002) (concluding that the trial court correctly denied the defendant's motion to suppress because the defendant had no Article I, section 9, privacy interest in the camp he was arrested at since the record supported the trial court's finding that he did not live there). Similarly, "a person must have a cognizable Fourth Amendment interest in the place [or effect] searched before seeking relief for an unconstitutional search." *Terrence Byrd v. United States*, 584 US 395, 410, 138 S Ct 1518, 200 L Ed 2d 805 (2018). Thus, the trial court did not err in denying defendant's motion to suppress on the ground that defendant did not retain a protected privacy interest or reasonable expectation of privacy in the copies of his messages sent to R and located in R's Facebook account records.

## II. BUSINESS RECORDS EXCEPTION

In his second assignment of error, defendant contends that the trial court erred in ruling that Facebook's records of R's account were admissible hearsay statements under the business records exception, OEC 803(6).

Whether a hearsay statement is admissible under the business records exception, OEC 803(6), is a question of

law. *Arrowood Indemnity Co. v. Fasching*, 369 Or 214, 250, 503 P3d 1233 (2022). A record must meet all of the following characteristics to be admitted under OEC 803(6):[3]

> "(1) describe acts, events, conditions, opinions, or diagnoses, (2) have been made at or near the time of those acts, events, conditions, opinions, or diagnoses, (3) have been made by, or from information transmitted by, a person with knowledge, (4) have been kept in the course of a regularly conducted business activity, and (5) have been made because it was the regular practice of that business activity to make such records."

*Id.* at 223-24 (internal quotation marks omitted). Thus, a party seeking to admit a record under the business records exception must provide sufficient evidence of the record-making practices of the business that created the record to satisfy each characteristic. *Id.* at 226. That evidence must be provided through the testimony of a records custodian or "other qualified person"; essentially, someone "[who] amounts to an 'insider' to describe the record-making process." *Id.* at 226, 240. The party seeking to admit the record does not need "to produce, or even identify, the specific individual upon whose firsthand knowledge the record is based. A sufficient foundation is laid if the proponent shows that it was the regular practice of the activity to base such a record upon a transmission from a person with knowledge." *Id.* at 241 (internal quotation marks omitted). However, even if the proponent satisfies the requirements of OEC 803(6), the record will not qualify for the exception if "the source of information or the method [or] circumstances of preparation

---

[3] OEC 803(6), provides:

"The following are not excluded by ORS 40.455, even though the declarant is available as a witness:

"* * * * *

"(6) A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method of circumstances of preparation indicate lack of trustworthiness. The term 'business' as used in this subsection includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit."

indicate lack of trustworthiness." *Id.* at 223 (quoting OEC 803(6) (brackets in original)).

"We review a trial court's evidentiary ruling in light of the record that was before the court at the time of the ruling." *State v. Yocom*, 334 Or App 34, 44, 555 P3d 322, *rev den*, 373 Or 154 (2024). The state served two warrants on Facebook for defendant's and R's account records on October 31, 2017. Facebook provided the state with R's records on November 14, 2017, and defendant's records on November 15, 2017.

During the second trial proceedings in 2023, the state filed a notice that it intended to offer the Facebook account records and an affidavit from Meta[4] records custodian Turner, dated April 2023, stating that the records provided to the state in 2017 were an exact copy of the records made and kept by Meta in the regular course of business in 2017, but noting that "Meta no longer retains a copy of the records provided." Defendant objected, arguing that the Meta affidavit did not satisfy the requirements of OEC 803(6) under *Arrowood* because the state needed to present a witness with firsthand knowledge of Facebook's record-keeping practices in 2017 to lay a foundation for the records. The trial court agreed.

During a later hearing, the state called Meta records custodian Moore to testify as a foundational witness for R's account records. Moore testified that she began her employment as a custodian of records sometime in mid-November 2017, had received "extensive" training in Facebook's record-making and record-keeping practices, and at the time of testifying had worked as a Meta custodian of records for five and a half years. She testified that Facebook account records can be identified by the user's name and by a "unique identifier" composed of a series of numbers that are "auto-generated" when a user creates their account. She was not aware of any changes to Facebook's record-keeping practices of user accounts at the start of her employment, stating that "[i]t's always been my understanding that we keep the data exactly how the user uploads it * * * [a]nd it's stored

---

[4] The company Facebook, which owns the social media platform also known as Facebook, in addition to other social media platforms, changed its name to Meta in 2021.

electronically in our servers." When asked if she had "ever heard of any deviation from that practice, even dating back to before [she] became an employee[,]" Moore responded, "I have not."

Moore also testified that she reviewed R's account records contained in the state's proffered exhibit and confirmed that they were records "kept in the regular course of Meta's business practices." Moore then explained how Meta's copies of records are generated and sent to law enforcement in response to requests.[5]

During the same hearing, Detective Verboort testified that, upon receiving the account records from Meta in mid-November 2017, he had "placed everything that [he] was able to download from the portal—placed it onto a disc, and that was placed into evidence." Verboort further testified that the records had remained in the secured evidence locker since he had originally placed them there in 2017.

Defendant objected, arguing that Moore's testimony was insufficient to establish a foundation for the records because Moore did not start working at Meta until about

---

[5] "[State]: How—tell—describe for the Court, if you would, how the records are transmitted to the law enforcement agency that's submitted the process.

"[Moore]: Yeah. We've got a secure portal that is for law enforcement only where they will upload their legal process.

"And then, once we receive it, we review it to make sure that it is, in fact, a valid legal process. And then we retrieve the data that they are requesting and send it back to law enforcement through that secure portal.

"[State]: Okay. And how—what, if any, measures are taken to make sure that the records don't get commingled or confused with one another or transmitted to the wrong agency?

"Are there any protocols or security practices in place in that regard?

"[Moore]: Well, we retrieve records for one singular account. And all of those records for the one singular account stay within their own set of records or their own production, if you will.

"Those will contain, you know, messages to and from other account holders, so that—you know, there would technically be data from other account holders if somebody is, you know, for example, messaging them. But that is the data that is contained within that singular account.

"In terms of making sure that we send it to the correct agency, I mean, that's just, you know, something that is part of our review process to make sure that it is a valid government-issued e-mail address that the records are going to."

a month after the police requested the records in October 2017 and so did not have personal knowledge of Meta's record-keeping practices at the exact time the records were generated. Defendant further argued that, because Meta no longer had a copy of the records, it was impossible to verify that the records offered at trial were a true and accurate copy of the original records. The trial court admitted the records, finding that *Arrowood*'s requirements had been met. Defendant raises the same arguments on appeal.

We conclude that there was sufficient evidence before the court at the time of its ruling for it to find that Moore had sufficient personal knowledge of Meta's record-keeping practices to testify to those practices. As noted above, the proponent of the evidence is not required to present the specific custodian responsible for creating the record at issue; other qualified witnesses, namely "insiders" of the business's practices, can demonstrate sufficient personal knowledge. Furthermore, nothing in *Arrowood* requires the foundational witness to have been employed at the exact time the specific records were requested and generated. While Moore was not the specific custodian who generated the R records, she testified that (1) she began her employment less than a month after the state served the warrants, (2) she was extensively trained on Meta's record-keeping practices right around the time the records at issue were generated, (3) she did not know of any recent changes to Meta's record-keeping practices when she began her employment, and (4) she was an expert in Meta's record-keeping practices. That testimony, coupled with her testimony of how account records are maintained and how copies of those records are generated in response to law enforcement requests, is sufficient to show that she had personal knowledge of those practices as a custodian of records of the business to establish a foundation for the records' admission under OEC 803(6).

Defendant also argues that, regardless of whether Moore was qualified to testify, the trial court should have nevertheless excluded the records because Meta no longer had the original copy of the records by the time of the second trial, and the state failed to provide adequate foundational

evidence from Meta of the records' accuracy or authenticity prior to the trial to satisfy the requirements of *Arrowood*.

Nothing in *Arrowood* or OEC 803(6) requires the continued existence of the original copy of the business record at issue to establish that the business's record-keeping practices are sufficiently reliable to allow for admission. As noted above, a record that otherwise satisfies the requirements of OEC 803(6) will not qualify for the exception only if "the source of information or the method of circumstances of preparation indicate lack of trustworthiness." OEC 803(6). We conclude that the state provided sufficient evidence from Meta, via Moore's testimony and the Turner certificate of authenticity, of the business's consistent method of preparing copies of account records in response to law enforcement requests to establish the R records' reliability. Thus, the trial court did not err in admitting the R records under OEC 803(6).

## III.　MOTION TO SUPPRESS STATEMENT OBTAINED OUTSIDE OF PRESENCE OF COUNSEL

In his third assignment of error, defendant contends that the trial court erred in denying defendant's motion to suppress a statement that he made during a custodial interview conducted following his arrest and without his counsel present in violation of defendant's right to counsel under Article I, section 11, of the Oregon Constitution. "We review a trial court's denial of a motion to suppress for legal error, and we are bound by the trial court's factual findings if there is any constitutionally sufficient evidence in the record to support them." *Maciel-Figueroa*, 361 Or at 165-66.

The relevant facts are undisputed. Several weeks after R's death, Detective Opitz messaged defendant asking if they could talk. Defendant responded that he would "be in" soon and named an attorney whom he was communicating with. Shortly after that exchange, a grand jury indicted defendant, and he was arrested a month later.

Immediately following his arrest, defendant was brought to the sheriff's office and placed in an interview room, where Detectives Verboort and Hays conducted a custodial interview that they recorded on video. At the

second trial, the state proffered, and the court admitted, a one-minute and 15-second clip of the beginning of the video recording. The clip shows that Verboort and Hays brought defendant into the interview room, and Hays administered *Miranda* warnings and confirmed defendant's understanding. Defendant did not ask for an attorney nor say that he was represented. Hays then confirmed defendant's first name and asked him whether that name was "short for anything." Defendant responded, "Ah, fucked. *** No. Just Chad." Hays then asked defendant to confirm the spelling of his last name.

Defendant moved to suppress defendant's statement in response to the question about his name, arguing that the detectives violated his Article I, section 11, right to counsel by conducting the interview without affording counsel an opportunity to attend. The trial court denied defendant's motion to suppress, and defendant now challenges that ruling.

Even assuming the detectives violated defendant's Article I, section 11, right to counsel, any error was harmless. In reviewing the record for harmlessness, "[w]e ask whether there was little likelihood that the error affected the jury's verdict." *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). At trial, defendant advanced two theories: (1) that his bullet did not hit R, and (2) that if his bullet did hit R, that defendant had acted in self-defense. On appeal, defendant argues that the alleged error was harmful because the state used the statement in both its opening statement and closing argument to highlight defendant's consciousness of guilt, which defendant contends served to undercut his claim of self-defense.

In reviewing the record, we disagree with defendant that any alleged error was harmful to either of defendant's theories. During opening statements, the state referenced defendant's statement as evidence of his awareness that he was in legal trouble for his actions:

"[The detectives] said, 'What's your name?' and [defendant] said, 'My name's Chad Pitcher,' and they said, 'Okay, Chad. What is that—is that short for something?' meaning, you know, is it Chadwick or something like that. And he

laughed—and you'll see video of this. He laughed and said, 'Yeah. Short for fucked,' essentially acknowledging that he was in a lot of hot water over this. And he laughed when he said that. And that's pretty much all he said. The—[defendant] was charged, and he's here—he's here today to begin trial."

During closing arguments, the state again urged the jury to view defendant's statement as evidence of his consciousness of guilt:

"When the defendant was arrested, and when he was at the police station, one of the things that I want you to remember, and you will have the—I think it's a CD—when he was asked, like, 'Hey, is Chad short for anything?', he told the detectives, 'Yeah, it's short for fucked.' Because at that point in time, [defendant] was in custody. He was finally caught for killing [R]. And he knew the gig was up."

However, at no point did the state argue that the statement was evidence that defendant could not have acted in self-defense, as demonstrated by the lack of reference to the statement during its discussion of the theory. Furthermore, the state did not ask the jury to specifically interpret the statement as an admission that defendant's bullet had killed R. The state referenced the statement only as evidence of defendant's awareness that he was in legal trouble, a somewhat obvious acknowledgement given the undisputed fact that defendant was in police custody after having been involved in a fatal shooting and hiding from police for several weeks. There is little likelihood that the way the state presented that evidence precluded the jury from finding that, despite defendant's undisputed involvement in the shooting, defendant's bullet had not killed R, or, in the alternative, that defendant had acted in self-defense. Because we conclude that, even if any failure to suppress the statement was error, that alleged error was harmless, we affirm.

IV.   INITIAL AGGRESSOR INSTRUCTION

In his fourth assignment of error, defendant contends that the trial court plainly erred by not defining "initial aggressor" when it instructed the jury on the limitation on self-defense. After the parties filed their opening briefs, the Supreme Court decided *State v. Worsham*, 373 Or 739,

571 P3d 759 (2025), *modified on recons*, 374 Or 781, 583 P3d 1042 (2026), in which it concluded that it is not plain error for the trial court to not instruct the jury on the definition of "initial aggressor" absent a request from the defendant for a supplemental instruction. In his reply brief, defendant acknowledges that *Worsham* forecloses his argument. We agree. The trial court thus did not commit plain error in not providing that instruction.

## V.   *CHITWOOD* STATEMENTS

In his fifth through eleventh assignments of error, defendant raises plain error challenges to statements that the prosecutor made during closing arguments. As defendant acknowledges, he is entitled to reversal only if he can show that the prosecutor's statements were obviously improper and, if so, whether it is "beyond dispute that the prosecutor's comments were so prejudicial as to have denied defendant a fair trial." *State v. Chitwood*, 370 Or 305, 312, 314-15, 518 P3d 903 (2022). Framed slightly differently, to meet that standard, the statements, individually or collectively, must have been both obviously improper *and* incurable. *State v. Perez*, 373 Or 591, 606, 568 P3d 940 (2025).

Among the statements that defendant challenges include:

- Thanking the jury on behalf of the victim's family for their time and attention;

- The prosecutor cared deeply about the case and was not prone to "dramatic things and hyperbole";

- Defendant acted as "the judge, the jury, and \*\*\* the executioner" when he killed the victim;

- Defense counsel's job is to "try to confuse" the jury;

- The self-defense instructions were confusing to laypeople, lawyers, and judges; and

- Asking the jury, on behalf of the victim and the victim's family, to hold defendant accountable by finding defendant guilty.

Even assuming that those statements, either individually or collectively, were improper (a proposition that

we express no opinion on), they did not deprive defendant of a fair trial. The prosecutor's statements did not confuse principles that are "fundamental to the American justice system," and the arguments did not rely on facts not in evidence. *Chitwood*, 370 Or at 314-15, 317. Indeed, as the state observes, the vast majority of the prosecutor's arguments focused on the evidence presented at trial and why that evidence supported a guilty verdict. On this record, there is no basis for us to conclude that a jury instruction to disregard the challenged statements "would not have been sufficiently curative to assure the court *** that the defendant received a fair trial." *Id.* at 312; *see also State v. Washington*, 355 Or 612, 660, 330 P3d 596, *cert den*, 574 US 1016 (2014) ("[A] proper jury instruction is adequate to cure any presumed prejudice from a prosecutor's improper statement.").

Affirmed.